181 P.2d 811

Ex parte ROMERO.

No. 5042.

Supreme Court of New Mexico.

June 9, 1947.

Edwin L. Swope, of Albuquerque, for petitioner.

William T. O'Sullivan, of Albuquerque, for respondent.

McGHEE, Justice.

The petitioner seeks his release from the Nazareth Sanatorium where he is detained for treatment of claimed mental disorder caused by the excessive drinking of intoxicating liquors.

It was stipulated that pending the final determination of the issues herein, the petitioner would be paroled to his wife, and that such period would not be deemed a part of the maximum statutory period during which the right to detain him was claimed.

The petitioner was admitted to the sanitarium on his written application under Sec. 37-223, 1941 Code, and the certificate of a doctor of medicine as provided in the succeeding section, and it is under these statutes that the respondent denied the verbal demand of the petitioner for his release made four days after his admission, and now claims the right to detain him. These statutes read:

"37-223. Voluntary Commitments.—The manager or chief medical officer of any

Veterans' Administration Hospital in this state, or the superintendent or person in charge of any hospital or institution offering care and treatment for persons with mental disorders in this state, may receive and detain therein as a patient any person suitable for care and treatment, and who voluntarily makes written application therefor. A person thus received at such hospital or institution shall not be detained under such voluntary commitment more than ten (10) days from and inclusive of the date of notice in writing of his intention or desire to leave such hospital or institution. (Laws 1939, ch. 43, § 1, p. 81.)"

"37-224. Emergency Commitments.—In addition to and supplementing the laws of this state requiring the commitment by order of court of insane persons, mentally incompetent persons and habitual drunkards, any person requiring immediate institutional care for mental disorder, may be received and detained by the superintendent of the Veterans' Administration Facilities, or other institutions offering care and treatment for such persons, upon a certificate executed by any doctor of medicine duly licensed to practice in this state. Such certificate will contain adequate reasons why such person should be immediately received by such institution, and will constitute authority for the detention of such person not to exceed thirty (30) days. (Laws 1939, ch. 43, § 2, p. 81.)"

Do these statutes deprive the petitioner of his liberty without due process of law?

■ The respondent urges that by the voluntary act of the petitioner in making the request for admission, he contracted with it to there remain and receive treatment until ten days after written notice of his desire or intention to terminate the same was given, unless sooner released. Obviously, it does not require citation of authority that one may not enforce such a contract made with a person he knows to be so disordered in mind as to require treatment in an institution for the treatment of mental diseases.

Vermont had a statute providing that the probate judge could commit a pauper to an asylum on the certificate of two practicing physicians that such person was insane. Lydia Ann Allen was so committed and sued out a writ of habeas corpus to secure her release. In Ex parte Allen, 82 Vt. 365, 73 A. 1078, 1082, 26 L.R.A.,N.S., 232, the court said: "If a person's right of hearing depends upon the grace, favor, or discretion of the persons, board, or tribunal whose duty it is to decide the question at issue, he is not protected in his constitutional right. The law must require notice to him, give him a right to a hearing, and an opportunity to be heard. Durkee v. City of Barre, 81 Vt. 530, 71 A. 819; Stuart v. Palmer, 74 N.Y. 183, 30 Am.Rep. 289; Underwood v. People, 32 Mich. 1, 20 Am.Rep.

633; In re Lambert, 134 Cal. 626, 66 P. 851, 55 L.R.A. 856, 86 Am.St.Rep. 296; State v. Billings, 55 Minn. 467, 57 N.W. 206, 794, 43 Am.St.Rep. 525."

While it was written many years ago, we think the following words of Judge Cooley in Van Deusen v. Newcomer, 40 Mich. 90, 127, relative to the confinement of a person thought to be insane on the judgment of a physician, are appropriate today.

"The careful study of the phenomena of insanity is confined almost exclusively to learned and humane members of this profession, and it would be gross ingratitude in society and in the State, if it were not ungrudgingly admitted that the ameliora-. tion of the condition of this unfortunate class, by relieving them of the barbarous and inhuman restraints to which ignorance formerly subjected them, and giving them the humane, soothing and healing treatment of comfortable asylums, is due mainly to the investigations and labors of this profession. But I cannot admit that because one is a practitioner of medicine, it is therefore proper or safe to suffer him to decide upon mental disease, and consign people to the asylum upon his judgment or certificate. While the high character of a large proportion of the medical profession, their learning, their self-devotion and humanity, entitle them to our highest respect and confidence, and give to their conclusions in questions of medical science a

weight that must generally challenge conviction, we cannot for a moment shut out from view the fact that the law throws wide open the doors of that profession, and that the ignorant jostle the learned in entering it, the unworthy have equal rights with the high-minded and humane, and it is not uncommon that the most unfit succeed for a long period in imposing upon the public. By no means known to the existing laws can it be rendered reasonably certain that, in the absence of public investigation, questions of insanity will be considered by competent persons and mistakes guarded against by those who are fit to judge.

"Nor even when the investigation is public and conducted with the assistance of experts do we fail to encounter difficulties of the most serious nature, arising from differences of opinion among those who are called to give scientific evidence. In every case where the evidences of mental disease are obscure, opinion is certain to be divided, and we are brought face to face with this conclusion, that if physicians exclusively were to deal with the case, the person would be turned over to the asylum or discharged as sane, according as one physician rather than another happened to be called in as the adviser. If the liberty of the citizen must depend upon such accidental circumstances, it ought very clearly to be made to appear either that the safety of society requires that such perils should

be encountered, or that adequate protection to those who are really insane admits of no better course."

By Act of Congress, 24 U.S.C.A. § 193, it was provided: "Insane patients of the Public Health Service shall be admitted into Saint Elizabeth Hospital upon the order of the Secretary of the Treasury, and shall be cared for therein until cured or until removed by the same authority. * * *"

Thomas Barry was transferred to the Saint Elizabeth Hospital under such an order and there confined as an insane person. He sued out a writ of habeas corpus to secure his release. The statement of the court, as reported in Barry v. Hall, 68 App.D.C. 350, 98 F.2d 222, 225, 226, is so expressive of our views that we quote therefrom as follows:

"The appellant's confinement in Saint Elizabeths under the Treasury Department letter until the time of the order of remand on the writ of habeas corpus of January 26, 1937, was illegal. Insanity is not a crime and therefore the constitutional guaranty of jury trial is not applicable; nevertheless, confinement in a mental hospital is as full and effective a deprivation of personal liberty as is confinement in jail. The Fifth Amendment is applicable in the District of Columbia, Sims v. Rives, 1936, 66 App.D.C. 24, 31, 84 F.2d 871, 878, and cases cited; and it guarantees that no person shall be deprived of liberty without due process of law. Due process of law does not necessarily mean a judicial proceeding —the proceeding may be adapted to the nature of the case—but it does necessitate an opportunity for a hearing and a defense. Ballard v. Hunter, 1907, 204 U.S. 241, 255, 27 S.Ct. 261, 51 L.Ed. 461; Simon v. Craft, 1901, 182 U.S. 427, 437, 21 S.Ct. 836, 45 L.Ed. 1165; In re Bryant, 1885, 3 Mackey 489, 14 D.C. 489; See Logue v. Fenning, 1907, 29 App.D.C. 519, 525; cf. Matter of Lambert, 1901, 134 Cal. 626, 66 P. 851, 55 L.R.A. 856, 86 Am.St.Rep. 296; In re Wellman, 1896, 3 Kan.App. 100, 45 P. 726; State v. Billings, 1894, 55 Minn. 467, 57 N.W. 206, 794, 43 Am.St.Rep. 525; Allgor v. New Jersey State Hospital, 1912, 80 N. J.Eq. 386, 84 A. 711; In re Allen, 1909, 82 Vt. 365, 73 A. 1078, 26 L.R.A.,N.S., 232. In Re Wellman, supra, a person alleged to be insane was committed to and confined in an institution without notice of the nature and pendency of the proceedings and without opportunity to be heard. The Court of Appeals of Kansas, in a habeas corpus proceeding, ordered discharge from the confinement, saying:

" 'Independently of statutes, every person is entitled to his day in court, and to the right to be heard before he is condemned. No mere ex parte proceeding can affect either personal or property rights. Were the legislature to attempt to enact a law authorizing judicial proceedings, the object

of which was to affect the person or property of a citizen, without notice or opportunity to be heard, such legislation would be rejected and repudiated in advance as an intolerable outrage upon the rights of the citizen. It would not only be a serious infringement of natural rights, but would be a flagrant violation of the constitutional guaranty that no person shall be deprived of his liberty or property without due process of law.

" 'Notice and opportunity to be heard lie at the foundation of all judicial procedure. They are fundamental principles of justice which cannot be ignored. Without them no citizen would be safe from the machinations of secret tribunals, and the most sane member of the community might be adjudged insane and landed in a madhouse. It will not do to say that it is useless to serve notice upon an insane person; that it would avail nothing because of his inability to take advantage of it. His sanity is the very thing to be tried. At the threshold of the inquiry the court is supposed to have no knowledge of the mental condition, but the presumption of the law is in favor of sanity. Insanity, like crime, does not exist in law until it is established by evidence in a proper proceeding. A trial without notice—a mere ex parte proceeding—has no proper place in a court of justice. It is a nullity, and void as affecting those not parties to it.' (3 Kan.App. at pages 103, 104, 45 P. at page 727)."

In New Mexico the district court is the only tribunal with authority to commit a person to an institution for treatment of mental disorders.

We are convinced that Secs. 37-223 and 37-224, supra, plainly violate the provisions of the Fourteenth Amendment to the Constitution of the United States, and Sec. 18 of Article 2 of the New Mexico Constitution, and that the petitioner is being illegally detained.

The order for his discharge, however, will not be effective until two days after its issuance in order that those responsible for his care and safety may institute proper legal proceedings if they are thought necessary, for we approve the rule that an insane person may be temporarily restrained without legal process, if his being at large would be dangerous to himself or others, preliminary to the institution of judicial proceedings for the determination of his mental condition. Ex parte Allen, supra; Maxwell v. Maxwell, 189 Iowa 7, 177 N.W. 541, 10 A.L.R. 482; Crawford v. Brown, 321 Ill. 305, 151 N.E. 911, 45 A.L.R. 1457.

Subject to the opportunity to file proper legal proceedings as above provided, we direct that the petitioner be released, and it is so ordered.

BRICE, C. J., and LUJAN, SADLER, and COMPTON, JJ., concur.